# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-586V

|  |  |
|---|---|
| CHRISTOPHER DERR,<br><br>　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: February 24, 2026 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Mary Novakovic, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On April 26, 2023, Christopher Derr filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered from Guillain Barré syndrome ("GBS") due to an influenza ("flu") vaccine administered on September 27, 2021. Petition at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters, and although Respondent conceded entitlement, the parties could not informally resolve damages.

For the reasons set forth below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount of **$160,000.00 for actual pain and suffering, plus $3,328.47 in past unreimbursable expenses, for a total of $163,328.47.**

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I.      **Relevant Procedural History**

Respondent filed a Rule 4(c) Report in May 2024 conceding that Petitioner was entitled to compensation in this matter; and I issued a Ruling on Entitlement thereafter. ECF Nos. 17, 19. The parties thereafter attempted to informally resolve damages but were unsuccessful; they subsequently filed briefs setting forth their competing views. ECF Nos. 26-27, 29. I proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF No. 30. The parties agreed[3] and the hearing was held as scheduled on February 23, 2026 (after a weather-related delay). Min. Entry, docketed Feb. 23, 2026. During the hearing, I also made an oral damages determination. This Decision memorializes those findings and determinations.

II.     **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in a specific case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009)

---

[3] Respondent objected to an expedited hearing on damages in this case, as he contends the issues had previously been fully briefed. ECF No. 32. He thus requested a ruling on record. *See id.* However, Respondent agreed to appear and respond to Petitioner's arguments should this matter be set for an expedited hearing. *Id.* at 2.

(finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may also rely on my own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior GBS compensation within SPU. I fully adopt and hereby incorporate my prior discussions in Section II of *Congdon v. Sec'y of Health & Hum. Servs.*, No. 23-2025V, 2025 WL 2734068, at *2-3 (Fed. Cl. Spec. Mstr. Aug. 21, 2025).

### III.    Appropriate Compensation in this Matter

#### A.  Actual Pain and Suffering

In this case, awareness of the injury is not disputed. Petitioner was a competent adult with no impairments that would impact his consciousness of his injury. Therefore, I analyze principally the severity and duration of the injury. When performing this analysis, I review the record as a whole, including the medical records and declarations filed, all assertions made by the parties in written documents, and the parties' arguments during the expedited damages hearing.

The evidence shows that prior to vaccination, Petitioner was receiving treatment for sprained ligaments of his lumbar spine and lower back, and lumbago with sciatica of his left side. Ex. 7 at 19-21, 46, 70. His complaints included cramping, numbness, and tingling in the lower extremities ("LEs") - specifically the lateral calf and left foot, altered sensation, and difficulties squatting/sitting down. *Id.* at 47-48, 58-59. Despite these symptoms, Petitioner's treaters noted on September 27, 2021 (the same day that he received the subject vaccination), that these symptoms were "about 90% better" and otherwise "resolved." *Id.* at 81, 89. He could ambulate on his own, was independent for all activities of daily living ("ADLs"), and was physically active. *See,* e.g., Ex. 9.

Following his vaccination, Petitioner (age 39 when vaccinated) suffered a moderately severe GBS illness resulting in significant weakness (and near complete paralysis for some time), debilitating functional and mobility impairments, and lengthy treatment at increasingly higher-level facilities. Petitioner required presentation at the

3

emergency room ("ER") within approximately two weeks of vaccination due to multiple falls and trouble walking. *See,* e.g., Ex. 5 at 41. Specifically, he experienced LE weakness to the point that Petitioner fell off a curb to the ground while holding his 16-month-old son. *See id.; see also* Ex. 9 ¶ 3. Following admission, Petitioner underwent diagnostic procedures, including a lumbar puncture ("LP"), and he was diagnosed with GBS within one day of admission. Ex. 5 at 26, 60. He received treatment with four rounds of IVIG, followed by some improvement at the conclusion of this four-day hospitalization. *Id.* at 63-64, 76 (reverse order).

Petitioner was then transferred to an inpatient rehabilitation facility, where he received occupational and physical therapy ("OT/PT") over the next eleven days. Ex. 5 at 400-03. But not long after arrival, his condition began to deteriorate, requiring a second hospitalization and repeat cycle of IVIG (two additional rounds, for six total). *Id.* at 215, 274, 276, 695, 715-16. When he improved with this second round of IVIG, Petitioner returned to inpatient rehabilitation for an additional 18 days, thus 29 total days in rehabilitation. *Id.* at 824-25. At the time of discharge from inpatient care in November 2021, Petitioner's condition and strength had improved – he was able to independently perform bed transfers, could walk up to 150ft, and was noted to be "overall independent with his ADLs from seated and standing position," but he still required a referral for home-health services, including at-home PT, and the use of a walker. *See id.* Petitioner was thus hospitalized and/or in in-patient rehabilitation from October 14 – November 19, 2021 (or for a total of approximately 37 days).

From November 26, 2021, to January 4, 2022, Petitioner underwent 12 at-home PT sessions. Ex. 6 at 40-166. He was homebound during this time and fully reliant on his wife for help with ADLs and transportation, and he used assisted devices for ambulation (i.e., a walker) to "safely navigate [his] environment." *Id.* at 40. At the start of his at-home treatment (thus November 2021), Petitioner attended follow-up visits with his primary care provider ("PCP") and reported numbness in his feet and fingers, fatigue, heaviness in the LEs, and intermittent diplopia. *See,* e.g., Ex. 2 at 36. He was wearing a foot orthotic on his left foot to address his foot drop. *Id.* at 36-37. At the conclusion of his at-home PT treatment, Petitioner could ambulate without assisted devices, his status was noted as "independent," and he was no longer homebound. Ex. 6 at 126, 151-54, 160.

By the time of Petitioner's first neurology follow-up visit in mid-January 2022 – just approximately four months post vaccination – Petitioner's treating neurologist opined that Petitioner was "doing remarkably well" and had made a "remarkable recovery[.]" Ex. 8 at 3-4. Though he still had "mild lingering symptoms," including mild paresthesias in his feet and subtle imbalance, he could walk without assisted devices and perform ADLs without difficulty; his diplopia had resolved; he exhibited 4-5/5 strength on examination; and he

4

was admittedly back at work and exercising. *See id*. Petitioner did not report "new neurological symptoms or issues," nor did he return to the neurologist thereafter. *Id.* at 4.

Petitioner had some PCP follow-up visits for his mild lingering symptoms (i.e., mild decrease in sensation in LEs plus numbness, fatigue, foot drop) throughout 2022, but by September of that year his PCP noted that Petitioner did "not have any residual symptoms that prevent him from doing normal activity," and GBS was not listed among Petitioner's active problem list – just one year post vaccination. Ex. 2 at 21, 23, 29-31.

Petitioner's GBS was thus moderately severe overall, requiring significant levels of treatment, multiple hospitalizations, six IVIG infusions, and treatment with at-home therapy. But despite Petitioner's contentions that he continues to experience GBS-sequelae nearly five years post-vaccination to this day (e.g., Br. at 22), there is insufficient evidence of ongoing symptoms in the medical records to support this position.

For instance, while Petitioner attended one PCP visit in January 2024 (with reports of an ongoing foot drop that was "improving but not fully resolved"), his treater did not recommend ongoing care specific to his GBS thereafter. Ex. 10 at 4. Rather, the treater opined Petitioner's GBS was "healing well." *Id.* at 5. More so, this visit occurred nearly one and a half years after Petitioner's last PCP follow-up for his GBS (in September 2022), and Petitioner did not return for further GBS-related care at all thereafter. Plus, this January 2024 visit occurred well into the pendency of this case (with the Petition having been filed in April 2023). This stand-alone visit is thus too attenuated from Petitioner's original treatment course to be tied to his vaccine-caused injury.

At the same time, I do not fully credit Respondent's argument that Petitioner's alleged ongoing symptoms (i.e., related to his left foot drop) can be wholly explained by his pre-existing lower back sprain and sciatica. *See,* e.g., Resp. at 9. Rather, it is far too difficult to determine whether his pre-vaccination symptoms were responsible for his ongoing symptomology and lingering effects based on the existing record. The existing record thus shows that Petitioner's vaccine-related injury had mostly resolved by fall 2022 (approximately 12 months post vaccination), with some lingering deficits thereafter that do not require ongoing care.

In his briefings and during the damages hearing, Petitioner cites to a number of damages decisions involving GBS injuries, highlighting the similarities between the petitioners in those cases and Petitioner. Br. at 23-26; Reply at 6-8.[4] Petitioner argues

---

[4] In particular, Petitioner cited to *McCray v. Sec'y of Health & Hum. Servs.,* No. 19-277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) (awarding $180,000 for actual pain and suffering); *Johnson v. Sec'y of Health & Hum. Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000 for actual pain and suffering); *Fedewa v. Sec'y of Health & Hum. Servs.,* No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020) (awarding $180,000 for actual pain and suffering); and *Kresl*

that an award of $180,000.00 is appropriate in this case. Br. at 26. Petitioner bases this request on his severe course of treatment (including admittance to acute hospital care on two occasions) and persistent symptomology. *Id.* at 22. He alleges that these persistent symptoms prohibit him from engaging in "passion" activities (including playing sports), and he has experienced a loss of athleticism at a young age and the sense of community with his neighbors that came along with such activities. *Id.* More so, Petitioner argues he has suffered continued psychological impacts of his injury, such as flashbacks to when he was paralyzed in the hospital and to the embarrassment experienced when he required care for basic needs such as bathing and using the bathroom. *See id.*; *see also* Exs. 9, 11. Petitioner also emphasizes that his two young sons were fearful of seeing him after he had been hospitalized and he felt a sense of guilt for abandoning his wife with the responsibilities of caring for Petitioner and their children during his acute phase. *See,* e.g., Exs. 9, 11.

Respondent, on the other hand, argues that Petitioner suffered a "relatively short and mild course of GBS," comparably speaking. Resp. at 7. Thus, Petitioner was hospitalized twice without significant complications, and at the time of discharge from inpatient care, he was able to independently perform ADLs; he was ambulating without assisted devices soon thereafter, and his symptoms were "largely resolved" by January 2022 – therefore evincing a "quick and substantial recovery." *Id.* at 7-8, 13. Respondent favorably compares the facts of Petitioner's circumstances to *Castellanos v. Sec'y of Health & Hum. Servs.,* No. 19-1710V, 2022 WL 1482497 (Fed. Cl. Spec. Mstr. Mar. 30, 2022),[5] and proposes an award of only $120,000.00. *See id.* at 10.

The overall record supports the conclusion that Petitioner suffered an especially severe injury, including complete LE paralysis while hospitalized. I have also generally noted that GBS has a more frightening and inherently-severe character as a vaccine injury, in comparison to other Program compensated vaccine injuries – and as a result, higher-than-average pain and suffering awards are usually appropriate when GBS is the injury. *See Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685 at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021).

This applies to Petitioner's case – even though the circumstances here are not the most severe seen in the Program in GBS cases. Petitioner should be awarded more than the $125,000.00 awarded in *Castellanos*, and thus more than the amount proffered by Respondent. *See* 2022 WL 1482497, at *7. While *Castellanos* and Petitioner experienced roughly the same duration of acute phases (a 9-day hospitalization and 30 days of in-

---

*v. Sec'y of Health & Hum. Servs.*, No. 22-0518V, 2024 WL 1931498 (Fed. Cl. Spec. Mstr. Apr. 1, 2024) (awarding $180,000 for actual pain and suffering).

[5] The Court awarded the *Castellanos* petitioner $125,000.00 in actual pain and suffering – thus more than Respondent's proffered award in this case.

patient rehabilitation in *Castellanos* versus 8-day hospitalization and 29-day inpatient care in the instant case), and both required the use of a walker or assisted device after hospitalization, the impact on that petitioner's life was not as severe thereafter, compared to Petitioner here. Rather, following his acute phase, Petitioner was then homebound and underwent 12 at-home PT sessions over one and a half months – during which he was reliant on his wife for ADLs, could not assist in the care of his two young sons, ambulate in his environment without assistance, or exercise as he typically did. Comparatively, the petitioner in *Castellanos* was 80 years old and sedentary at the time of his vaccination; he ambulated short distances and did not lose the enjoyment of physical activities to much degree. *See id.* I acknowledge that both claimants experienced a relatively good recovery and fairly quickly – making Respondent's reliance on this case somewhat understandable. Still, I find the circumstances of *Castellanos* to be ultimately inapt.

I find the comparable damages determinations offered by Petitioner to be helpful in providing a reasonable outcome pertaining to the instant case. Nonetheless, Petitioner's circumstances do not warrant an award quite as high as his requested amount of $180,000.00 for pain and suffering, that was also awarded in the cases which he relies upon for support.

For example, the petitioner in *McCray* had a similar duration of hospitalizations and inpatient care (12 days hospitalization versus 8, and 21 days inpatient versus 29 days, respectively). *See* 2021 WL 4618549. However, the severity of the *McCray* petitioner's injury was more severe in that she experienced more than four years of residual effects, such as fatigue and painful neuropathy (thus requiring treatment with long-term medications), and the long-term use of a cane – never returning to her baseline or regaining complete independence with ADLs. *See id.* Here, Petitioner regained independence with ADLs, and the medical records show that he mostly returned to his baseline by making a "remarkable recovery." Ex. 8 at 3-4. More so, the *McCray* petitioner experienced other residual effects of her GBS, including new-onset asthma (requiring an inhaler) and anxiety. Notably (and unlike Petitioner here), the *McCray* petitioner was unable to return to her part-time job due to her ongoing pain. Petitioner here admittedly returned to work and did not report ongoing pain, therefore supporting a lesser award.

Additionally, Petitioner's treatment course was less severe than what the *Kresl* petitioner experienced. *See* 2024 WL 1931498 at *2. That individual was hospitalized for ten days, during which time she underwent diagnostic procedures, including a CT and MRIs (which Petitioner here did not have), and she was transferred to the ICU. *See id.* The *Kresl* petitioner required 35 days of inpatient care, followed by 13 outpatient OT sessions *and* 35 PT sessions; she was ultimately unable to return to her role as a substitute teacher. *Id.* While the duration of both claimants' courses of treatment was somewhat similar in length (11 months versus approximately one year), with lasting

residuals, the *Kresl* petitioner required the use of long-term gabapentin, whereas Petitioner's lingering symptoms do not necessitate treatment with medication. Additionally, the *Kresl* petitioner's advanced age was considered in evaluating the impact of her injury but was not considered grounds for a lesser award in that case. Petitioner here was relatively young, healthy, and active prior to vaccination when he experienced frightening symptoms of his vaccine-caused GBS, leaving lasting effects on his young family, and such factors are thus deserving of some weight in awarding pain and suffering. But when weighed against the totality of the *Kresl* petitioner's injury course, Petitioner deserves a lesser award.

The remaining two cases cited by Petitioner (*Johnson* and *Fedewa*) were decided by another special master and outside of the SPU context. I accordingly give these cases slightly less weight in assessing damages in this situation (since SPU has been attempting for more than five years to systematize awards, in order to ensure better overall conformity) but will nevertheless discuss some distinguishing features. The *Johnson* petitioner's acute course included a five-day hospitalization and *no* inpatient rehabilitation. *See* 2018 WL 5024012. Despite this minimizing factor, that petitioner required in-home PT, and *Johnson's* course was made more difficult as a result of over 45 personal training sessions, compounded by the difficulties in travel associated with that petitioner's rural geographic location. *See id.* The *Johnson* petitioner's residual effects included fatigue, numbness, and incontinence, to the point that she required always keeping a spare change of clothes with her out of fear of not knowing when she required use of the bathroom. *Id. Johnson* was forced to modify her role from a bus driver to a librarian (with modified/lesser duties) as a result of her ongoing GBS sequelae. Petitioner has not shown that he experienced any modifications to work or that he experiences sequelae to that degree sufficient to justify an equal award.

Similarly, the *Fedewa* petitioner's injury involved a more severe clinical course than Petitioner in the instant case. *See* 2020 WL 1915138. For example, the *Fedewa* petitioner experienced a "botched" and painful LP, thus requiring a repeat procedure, and he underwent EMGs. *See id.* Unlike Petitioner here, the petitioner in *Fedewa* did not respond well to IVIG treatment, and, as a result, he was unable to work or drive for three months following his acute phase. *Id.* When the *Fedewa* petitioner returned to work, it was out of financial necessity, not because his symptoms had fully resolved; he had work-lifting restrictions (on a hobby farm); and he experienced ongoing pain for more than two and a half years. *Id.* Additionally, the *Fedewa* petitioner experienced, was diagnosed with, and received long-term care (i.e., with medication) for depression caused by his GBS. Such factors thus speak to an appropriately higher award than what is warranted in this case. Still, Petitioner here and the *Fedewa* petitioner both experienced an interruption in the activities they once participated for enjoyment, and their vaccine-caused GBS interfered

with each petitioner's ability to care for their young children to some degree – thus providing a somewhat useful comparison.

Although Petitioner enjoyed a greater and fairly complete recovery following his approximate 12-month course compared to some of the petitioners in the cases he relies upon for support, he continues to suffer from some long-term, lingering physical effects of his GBS (including numbness in his toes and heaviness in his feet). He also experiences emotional effects, including flashbacks to being unable to walk and when he was reliant on others for basic human needs. Petitioner has demonstrated that these ongoing symptoms impact his ability to engage in passion activities such as playing sports and exercising (which brought him a sense of community) and running around with his children to an extent. Ex. 11. Nonetheless, while Petitioner had fairly significant treatment early on in his course, he had a fairly successful recovery within a year of vaccination, without objective proof of in the record of ongoing neurological deficiencies or treatment.

I also note that in Program cases where more than $175,000.00 is awarded (including those relied upon by Petitioner), the injured parties tend to have experienced ongoing and obviously severe residual symptoms, and not just the kind of sequelae common in the aftermath of GBS. And many such petitioners have faced permanent limitations on the nature of the work they could perform. Petitioner's argument in his briefings that his quality of life has "been indelibly and permanently diminished" as a result of his vaccine-caused GBS, that his GBS "robbed him of a healthy and happy lifestyle," or that his injury has "led to a plateau in health and wellness," is not supported by the record – even if I credit his ongoing sequelae (Br. at 22-24). Despite a rather severe acute phase, including hospitalization twice and two separate rounds of IVIG, Petitioner managed to recover quickly and successfully overall, for this kind of injury. I therefore award actual pain and suffering in the amount of **$160,000.00.**

## CONCLUSION

In light of all of the above, I award **Petitioner a lump sum payment of $163,328.47**, **(representing compensation for actual pain and suffering and past unreimbursable expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[6]

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master